## HARLEY GRANT FUNDERBURK *v.* STATE OF MARYLAND

[No. 409, September Term, 1970.]

*Decided July 30, 1971.*

The cause was argued before MURPHY, C. J., and AN-DERSON and ORTH, JJ.

*Gerald A. Smith* for appellant.

*Robert A. DiCicco, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, How-ard L. Cardin, State's Attorney for Baltimore City* and *Charles O. Fisher, Jr., Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ANDERSON, J., delivered the opinion of the Court.

Appellant, Harley Grant Funderburk, and Dulaney Tom Simmons were separately indicted for the rape of Rosetta Cure, which was alleged to have occurred some-time after midnight on April 19, 1969, in a house lo-cated at 735 West Fayette Street in Baltimore. Simmons was arrested on the morning of the crime, and after in-dictment was tried on October 14, 1969 in the Criminal Court of Baltimore, in a bench trial, and was found guilty of rape. Prior to his trial and while in the city jail, he told his mother he wished to see Funderburk. When Mrs. Simmons saw Funderburk she relayed the message and sometime later Funderburk visited Simmons in the Bal-timore City jail. At that time he asked Funderburk to go down and see his lawyer and explain to him what happened. At the time of Simmons' trial on October 14, 1969, Funderburk was in the Baltimore City jail on an-other charge and a summons was issued for him to ap-pear as a witness for the defense. Simmons saw Funder-burk in the lockup in the Court House just prior to his trial and at that time they discussed the case and what Funderburk was going to say. After Simmons had testi-fied in his own behalf, his attorney called Funderburk

as a witness for the defense. At that time Funderburk had not been indicted for the rape of Mrs. Cure but expressed a willingness to testify for Simmons. The trial judge, foreseeing that his testimony might bring about his indictment for the same crime, refused to allow him to testify without the advice of an attorney, and requested Mr. Maxwell, an attorney then in the courtroom, to consult with him about whether or not he should testify. After consulting with the attorney, Funderburk was called to the stand as a defense witness, but refused to testify on the grounds that his testimony might incriminate him.

Appellant, Harley Grant Funderburk, was indicted on October 23, 1969, in an indictment charging him with the rape of Rosetta Cure and allied counts. He was tried in the Criminal Court of Baltimore on March 31, 1970, by a jury, Judge David Ross presiding, and was convicted of assault with intent to rape (2nd count) and sentenced to a term of twenty years under the jurisdiction of the Department of Correctional Services.

On appeal, appellant Funderburk raises two contentions:

1) That the trial court erred in allowing the State, over the objection of the defendant, to cross-examine the defendant as to the reasons why he exercised his Fifth Amendment right against self-incrimination in the prior criminal trial of Dulaney Tom Simmons, an alleged accomplice.

2) That the trial court erred in allowing the State to examine Rebecca Simmons as to an alleged inculpatory statement made by the defendant when the State had neither answered nor excepted to an interrogatory contained in defendant's motion for Discovery and Inspection, which elicited said information.

At appellant's trial the victim, Rosetta Cure, a 33 year

old mother of nine children, testified that on the evening of April 18, 1969 she and her husband had gone to 116 Pine Street in Baltimore to visit friends. There was some record playing and drinking and when Mrs. Cure prepared to leave, sometime after twelve midnight, her husband was asleep, and as she had to return to her children, she left alone. When she reached the corner of Pine and Fayette Streets a man walked up to her and asked her for a match. She gave him a light off her cigarette, and as she did so, he grabbed her arm and twisted it behind her back. He then forced her to walk to 735 West Fayette Street where he threatened to kill her with a knife if she did not submit to him, and after having gone to the second floor returned to the hallway on the first floor where he raped her.[1] He then called upstairs and a second man came down the steps. Her first attacker then left and the second man, identified as Dulaney Tom Simmons, also raped her. She was then allowed to leave and went directly to the Pine Street police station of the Baltimore City Police Department and reported the attacks. She was examined at the police station by Dr. George E. Wells, Jr., who testified that from his examination he determined she had had sexual relations prior to the examination.

Rebecca Simmons, a witness for the State and mother of Dulaney Tom Simmons, testified, over objection by appellant, that some three or four weeks after April 19, 1969 appellant came to her home at 837 Vine Street and asked her when he could see her son as he wished to talk to him. At that time he told her that her son Tom Simmons, also called Lemuel, was not the one who put the knife around the lady's throat and carried her to Burell's house but that he (the appellant) was the one.

Appellant took the stand in his own behalf and testi-

---

1. A motion to suppress the in-court identification of appellant by the witness was heard prior to the jury being sworn and was granted since it was found by the court to be tainted as a result of a certain conversation between the Assistant State's Attorney and the witness at the trial of Dulaney Tom Simmons. The State agreed with the court's ruling on the motion.

fied that on the evening of April 19, 1969 he and his girl friend, Louise Smith, had gone to a movie and afterwards had gone to the Dixie Carry Out Shop at Fayette and Fremont Streets. As they were leaving, he saw the complaining witness, Rosetta Cure, in the company of a man he knew as Ollie Thyson. He saw Thyson give her some money and leave. He then saw her with Simmons, whom he had known, after which he returned to 1436 North Broadway where he spent the night with his girl friend. He denied that he had raped Rosetta Cure or had ever been with her and denied that he had gone to 735 West Fayette Street.

Dulaney Tom Simmons was called as a witness on rebuttal by the State. He testified that on the evening of April 18, 1969 he had gone to the home of his uncle, Burell Simmons, at 735 West Fayette Street about 9:00 p.m. where he had laid down on a couch and fallen asleep.[2] He was awakened sometime after 12:00 midnight by the appellant, Harley Funderburk, who had a woman with him. He got the woman a glass of water and as he carried it back to the kitchen he saw them leaving. Shortly thereafter, he went downstairs. The woman was lying on the floor in the downstairs hallway and appellant Funderburk was leaving. He testified that he then had a relationship with the woman, whom he identified as Rosetta Cure. Afterwards she told him that Funderburk had a knife on her. She asked him where she could catch a bus to get to Mount Wyman. He told her that he did not know but that she could stay the rest of the night if she wished. She said that she had to go, and he gave her thirty cents and she left.

## I

Appellant contends that the trial court erred in allowing the State to elicit from him, over objection, the reasons and circumstances for his refusal to testify at the

---

2. Burell Simmons and Eddie Parks occupied the 2nd floor apartment in the house at 735 West Fayette Street consisting of 2 rooms, a bedroom and kitchen.

October 14, 1969 trial of Dulaney Tom Simmons. He argues that no inference of guilt is to be drawn from his exercise of the Fifth Amendment right against self-incrimination, and that the only purpose served by the questions put forth by the State in relation to defendant's exercise of this fundamental right was to create an inference of guilt.

We do not agree. On direct examination appellant sought to explain the reasons as to why he had refused to testify for Dulaney Tom Simmons and had exercised his Fifth Amendment right against self-incrimination. His apparent purpose was to show bias on the part of Rebecca Simmons, mother of Dulaney Tom Simmons, because of his refusal to testify at her son's prior trial, to refute and discredit the testimony of Dulaney Tom Simmons, and to show bias on his part because of his refusal to testify for him. By so doing he waived his right against self-incrimination under the Fifth Amendment which he had claimed at the previous trial of Simmons and was subject to cross-examination as to why he had refused to testify. The following excerpts from the transcript are revealing:

> BY MR. SMITH (Appellant's counsel):
> "Q. How long have you known Mr. Simmons?
> A. Maybe seven years.
> "Q. What's that?
> A. Maybe seven years.
> "Q. You say you did visit Mr. Simmons, is that correct?
> A. Yes.
> "Q. And at that time, was there any discussion about your being a witness for him?
> A. Yes, it was. He had asked me to —
> MR. FISHER: (Assistant State's Attorney) Objection.
> THE COURT: Overruled.
> THE WITNESS: He had asked me to appear in court for him as a witness because

Mr. Thyson who was his main witness I presume, had gotten killed in June and he wanted me to say that I had brought Mrs. Cure to his house as a subject for prostitution and I told him I refuse to say it because it wasn't true and I wouldn't get involved with it, but I would say that I seen her that night and she was intoxicated.

BY MR. SMITH:

"Q. Did there come a time when you were subpoenaed as a witness?

A. Yes.

"Q. In this case?

A. Yes.

"Q. And at the time that you were subpoenaed as a witness, did you refuse to testify?

A. Yes.

"Q. And was his mother present at that time or do you know?

A. I think she was, I'm not positive, but I think she was.

"Q. Will you describe for the Court and jury, you say that Mrs. Cure was intoxicated. Will you describe what you mean by that if you can remember how she was, just what she was doing?

A. Well, I wouldn't call her a sloppy drunk. I would say she would have needed a little assistance but she wasn't totally drunk.

"Q. Is this when she was walking with Mr. Thyson that you observed her?

A. Yes."

Subsequently, on cross-examination, the State attempted to explore this direct testimony, whereupon the following transpired:

BY MR. FISHER:

"Q. You say you refused to testify when Mr.

Simmons called you as a witness back in October, is that right?

A. Yes.

"Q. Has that always been your intention, not to testify?

A. No.

MR. SMITH: Your Honor, I object to this line of questioning.

THE COURT: May I see counsel, please?

(Whereupon the following discussion took place at the Bench:

THE COURT: What is the basis for the objection?

MR. SMITH: This man has an absolute right not to testify.

THE COURT: It was brought out on direct examination. It was opened up.

MR. FISHER: That's right.

MR. SMITH: Ask him if he testified, but I don't think he has to go into his reasons. I think it's done to establish possible bias on the part of the witness.

THE COURT: On cross-examination the State has the full right to show there was no bias.

MR. SMITH: He can't show there was no bias by asking him about exercising his constitutional rights.

THE COURT: I know we are dealing with constitutional rights, that's the reason I brought you up, but I know of no provisions against being required to explain why. He did not have an absolute right to refuse to testify. The only time he can refuse to testify is when it would tend to incriminate him and it was opened up on direct examination.

MR. SMITH: I don't think he has a right to do that.

THE COURT: I will overrule the objection.)

(Whereupon the attorneys returned to their respective trial tables.)

BY MR. FISHER:

"Q. Mr. Funderburk, on October the 14th when you first came into the courtroom, you did intend to testify, did you not?

A. Yes.

"Q. But you changed your mind?

A. Yes.

"Q. Why did you change your mind?

A. Because he told me that the lady had already indicated —

MR. SMITH: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: The lawyer had already told me the lady indicated it was two people that assaulted her and if I was to testify or anything, anything I might say would be harmful to me and to refuse to answer the questions on the grounds that it might tend to incriminate me.

BY MR. FISHER:

"Q. And you did refuse to testify on that basis?

A. Yes."

Appellant argues that the State's only intended purpose in questioning him on this matter was to create an impermissible and incurable inference of guilt and not to impeach appellant's credibility as the State contends. We do not agree with this argument. We feel that appellant having gone into the matter in depth on direct examination the State had the full right to attempt to impeach his credibility on cross-examination. When the appellant took the stand in his own behalf he could be cross-examined as to the facts and issues within the limits of appropriate rules of evidence. *Raffel v. United States,* 271 U. S. 494, 46 S. Ct. 566; *Grunewald v. United*

*States,* 353 U. S. 391, 77 S. Ct. 963; *United States v. Comi,* 336 F. 2d 856 (4th Cir. 1964), cert. denied 379 U. S. 992. Appellant's reliance on *Grunewald v. United States, supra,* is not applicable here under the circumstances of this case.

## II

Appellant next contends that the court erred in allowing the State to examine the witness, Rebecca Simmons, mother of Dulaney Tom Simmons, as to an alleged incriminating statement made to her by the appellant, since the State had never answered or excepted to appellant's motion for discovery and inspection pursuant to Maryland Rule 728.

During the trial the State called Rebecca Simmons to the stand to testify. When the State proceeded to question her about an incriminating statement made to her by appellant Funderburk,[3] defense counsel objected, claiming that the statement was not made available to appellant prior to trial despite appellant's pretrial discovery motion, pursuant to Maryland Rule 728 a.b.[4]

It is apparent from the record that although the State never answered the motion for discovery and inspection, the appellant never requested an order to compel discovery under Maryland Rule 728 a.b.

After hearing extensive argument on the issue, the court overruled the objection. In so doing, the trial judge pointed out that neither the State nor the defense had complied with the Rule, but held, regardless of this, that the State was not obliged to furnish the appellant with any statement by appellant to a witness which did not come within the purview of Rule 728, and that since Mrs. Simmons was not a State agent any statement made by

---

3. Mrs. Simmons testified that after her son was indicted for rape appellant Funderburk came over to her house and said, "Lemuel wasn't the one who put the knife around the lady's throat and carried her to Burell's house, I was the one."

4. The sole information on discovery which the appellant contends should have been furnished was as follows: "2. Furnish the Defendant with a copy of any oral statement, if any, made by the Defendant to any police officer, State's Attorney, Law Enforcement Officer, or other."

appellant to her would not be discoverable even though appellant had obtained an order under Maryland Rule 728 b., citing *Smith v. State,* 4 Md. App. 146.

In *Smith v. State, supra,* at 153, this Court held that the State was not obliged to furnish the defendant with the substance of oral statements which did not involve State agents because said statements did not come within the purview of Maryland Rule 728. See also *Barton v. State,* 2 Md. App. 52, 57.

Moreover, appellant knew Mrs. Simmons was a possible witness since the beginning of the trial but made no effort to ascertain what her testimony would be until it was revealed at a bench conference on the second day of the trial, nor did he request a postponement or continuance after he became aware of her testimony.

*Judgment affirmed.*