OPINION OF THE COURT
Fritz W. Alexander, J.
The Attorney-General seeks an order of this court barring the respondent attorney from representing and/or providing legal assistance to some 14 individuals, all of whom are employees of and work in the box office of a large sports arena,* in connection with an investigation under *135 taken by the Attorney-General into the practices of the arena’s box office personnel in the sale and distribution of tickets.
It appears that pursuant to the authority conferred by article 26-A of the General Business Law, the Attorney-General has undertaken an investigation into the practices of the box office personnel of the arena in the sale and distribution of tickets. The investigation focuses principally on the manner of distribution of tickets to concerts held there in November and December, 1980, and the manner of distribution of Ticketron tickets to the January, 1981 performance of a hit Broadway production. The Attorney-General alleges that evidence has been uncovered which indicates that despite public announcement that tickets to the concerts would only be sold by mail-order subscriptions, postmarked on or after October 1,1980, and despite the fact that, because of the heavy volume of subscriptions, only those requests postmarked on October 1, were honored, several of the money orders cashed by the arena as proceeds of concert ticket sales were purchased in bulk weeks after October 1. It also appears that many of the names and addresses of purported subscribers, listed on the arena box office records, kept as required by the General Business Law, are in fact the names and addresses of nonexistent people or are of people who neither requested nor received tickets to the concerts. It is alleged that the evidence uncovered indicates that box office personnel may have personally received falsely completed money orders from ticket brokers in return for quantities of tickets and demanded and received “ice” (money in excess of the regular ticket price) from the ticket brokers. These brokers then “scalped” these tickets; that is, sold them for a price in excess of the permitted surcharge above the tickets’ face value.
Additionally, it is alleged that evidence uncovered by the Attorney-General indicates that some person or persons among the box office staff provided large quantities of Ticketron tickets to the Broadway production to ticket *136 brokers, apparently in return for the brokers paying “ice” to members of the box office staff. Such payments, if made in either instance, would be in violation of section 169-k of article 10-C of the General Business Law which makes it a criminal offense for theatre ticket personnel to receive unlawful charges in connection with the sale and distribution of tickets.
Fourteen ticket sellers and supervisors in the arena box office were subpoenaed by the Attorney-General to appear and give testimony concerning their conduct and the conduct of their co-workers in connection with these events. Each of these employees is represented by the respondent attorney. Seven of them asserted their privilege against self incrimination when they appeared pursuant to subpoena; two of them were neither sworn nor questioned at their appearances following their acknowledgment of an understanding of the problems created by the respondent attorney’s multiple representation and their purportedly waiving any conflict of interest created by that multiple representation. The five remaining employees have been subpoenaed but their appearances were adjourned when the Attorney-General was advised by respondent attorney that he would represent each of them at their appearances. Two of the employees who had claimed their privilege against self incrimination at their prior appearances before the Attorney-General were recalled, given transactional immunity and testified. It is asserted by the Attorney-General that their testimony, which centered on the Broadway production, was essentially the same and failed to inculpate anyone in the events under investigation. The testimony given by these two employees is said to be contradicted, in significant part, by the documentary evidence uncovered by the Attorney-General. The inquiry therefore has been expanded to allow for the possible development of a perjury case against these two employees.
Two other of the box office employees who claimed their Fifth Amendment privilege against self incrimination when questioned about the Broadway production, were given “target warnings”, but were not granted transactional immunity.
*137 On this application, the Attorney-General contends that ethical considerations and the applicable law require disqualification of respondent attorney from this multiple representation, and because actual conflicts of interest are created by that multiple representation, the employees cannot waive their Sixth Amendment right to conflict-free effective assistance of counsel.
Each of the employees has submitted an affidavit in which awareness of the attorney’s representation of the others is acknowledged, the existence of any conflict of interest arising out of that multiple representation is denied and the contention is made that the Attorney-General’s application seeks to deprive the employee of his right to counsel of choice.
Additionally, respondent attorney challenges the jurisdiction of the Attorney-General to conduct the investigation he had undertaken. He contends that the concert and the Broadway production investigations are separate investigations, each of which involves or potentially involves different members of the box office staff and that therefore no conflict of interest exists in his multiple representation. Additionally, he argues that no sufficient factual predicate upon which a finding of a conflict of interest can be grounded has been presented.
He advances the view that the concerts were not “theatrical productions” as defined in section 399-c of article 26-A of the General Business Law and therefore that the Attorney-General is without authority to conduct an investigation into the sale of concert tickets. The attorney respondent urges that the subpoenas issued in respect thereto be quashed.
These arguments are without merit. They are predicated upon the fallacious assumption that the investigation undertaken by the Attorney-General is directed to the two separate “events”, i.e., the January, 1981 performance of the Broadway production and the concerts staged at the arena in November and December of 1980. The investigation, rather, is into the “practices of [the arena] box office personnel in the sale and distribution of tickets.” The focus of the investigation happens to be directed to the manner of distribution of tickets to these performances by box office *138 personnel and seeks to determine whether that personnel or some of them illegally distributed or arranged for the distribution of tickets in exchange for the payment to them of “ice”. If these practices in fact occurred, they clearly would be in violation of the provisions of article 26-A (§ 399-n, subd 4) of the General Business Law as well as section 169-k of article 10-C.
The argument that the concerts were not “theatrical productions” as defined in section 399-c of article 26-A and, therefore, that the Attorney-General lacks the authority to investigate the circumstances surrounding the sale and distribution of these tickets, overlooks the broad investigatory power given the Attorney-General where “it shall appear * * * that any person has violated * * * any provision of this article [26-A] or that he believes it necessary to aid in the enforcement of this article * * * [to] make such public or private investigations * * * as he deems necessary to determine whether any person has violated * * * any provision of this article or any rule or regulation hereunder” (General Business Law, § 399-d, subd 1).
Moreover, these arguments advanced by respondent counsel misperceive the clear legislative intent and statutory scheme embodied in article 26-A of the General Business Law. As originally enacted in 1964, article 26-A related primarily to “theatrical syndication financing” and defined a “theatrical production” in section 399-c as a live-staged dramatic play or dramatic musical production shown to the public for profit and financed wholly or in part by offering for sale through investment agreement, limited partnerships and other similar financial arrangements. That enactment was designed primarily to encourage and protect, by legislation, the production and financing of legitimate plays and musical theatre by protecting the theatre investor and the public as a whole from the abuses in financial and accounting aspects of legitimate theatre productions uncovered by the Syndication Bureau of the Attorney-General’s office (see Memorandum of State Department of Law for L 1964, ch 728, McKinney’s Session Laws of NY, 1964, p 1891).
That initial enactment made no reference to ticket sales or record keeping. Article 26-A was amended the next year *139 to add a new section 399-n (L 1965, ch 325) which, inter alla, required the registration of all personnel involved in theatre ticket sales and distribution, the maintenance of full and accurate records of theatre ticket transactions and extended its coverage to any owner, operator or lessee of a theatre showing theatrical productions, “as defined herein” (§ 399-n, subd 1). Subdivision 2 of section 399-n defined a “theatrical production” to mean “[T]hose live-staged dramatic plays and dramatic-musical productions which hereafter are shown to the public in a theatre run for profit.” Significantly, and understandably since this amendment was specifically focused, no mention of “financing” is included in this definition of “theatrical production”.
Section 399-n was amended again in 1978 to extend its coverage to “sporting event[s]” and “sporting event[s] personnel” (L 1978, ch 226). The Attorney-General’s power with respect to the regulation of persons who sell theatre tickets was extended to cover persons who sell tickets to sporting events and he was empowered to issue orders canceling or suspending the name of persons registered to sell tickets to a “sporting event”, in like manner as he was then empowered in respect to persons registered to sell theatre tickets.
“ ‘[Sjporting event personnel’ ” is defined to include “all owners, operators or operating lessees who control the operation of a * * * stadium, garden, or other place where * * * sporting events are held” and includes all “agents, representatives, employees and licensees of any of the aforementioned” (General Business Law, § 399-n, subd 1). Such persons are required to be registered with the Attorney-General, just as theatre personnel and unregistered persons are barred from selling tickets to sporting events. Directly or indirectly demanding, exacting, accepting or receiving any premium or price in excess of the regular or established price or charge for sporting events tickets was established as cause for cancellation or suspension of the personnel of “a theatre, stadium, garden, or other place where theatre or sporting events are held” (§ 399-n, subd 1).
To bar the investigation into the manner of sale and distribution of the subject concert tickets and quash the *140 subpoenas issued in respect thereto, for the reason that the concerts were not “theatrical productions” as defined in section 399-c as urged by respondent attorney, not only would defy logic and common sense, but would ignore the provisions of section 399-n and the clear mandate of article 26-A (§ 399-o, subd 2) of the General Business Law, which commands that “This article shall be liberally construed to effect the purposes thereof.”
The question of whether or not the application of the Attorney-General to debar respondent attorney from the multiple representation he has undertaken of the 14 box office staff members presents a more troublesome issue.
There can be no doubt as to the court’s power, indeed its duty, to bar such multiple representation in respect to Grand Jury proceedings where conflicts of interest exist and where such representation would prevent the proper functioning of the Grand Jury. (See People v Doe, 98 Misc 2d 805, 810, and cases cited therein.)
Nor can there be any doubt as to the court’s power and duty to intervene in respect to this investigation to forbid the multiple representation should it be established that the Attorney-General’s effort to discharge his statutory duty to correct and punish abuses relating to the sale and distribution of tickets to theatrical productions and sporting events is being unduly impeded by such multiple representation. The court would, as well, be required to preclude the multiple representation should it be established that actual conflicts of interest exist among the various clients sought to be represented by the single attorney.
While the Grand Jury analogy is not totally apposite, the principles applicable there have pertinence here. Just as no witness may interfere with the course of a Grand Jury’s inquiry or set limits upon its investigation (Matter of Grand Jury, 446 F Supp 1132), the Attorney-General’s inquiry may not be impeded or limited by any witness called to give testimony relevant to that inquiry. Constitutional and legal guidelines should be limits upon the Attorney-General’s investigation, not external influence or supervision. Indeed, the public’s interest in a thorough investigation of criminal activity, or at the least, activity *141 that apparently continues the abuses regarding the sale and distribution of theatre and sporting event tickets the Legislature sought to curtail, if not eliminate, is a substantial State interest and weighs heavily in the balancing against a witnesses’ right to representation by counsel of choice. And while a “court should not arbitrarily interfere with the attorney-client relationship” (People v Gomberg, 38 NY2d 307, 313), or forbid counsel of his choice to a witness before a Grand Jury, its power to regulate the conduct of attorneys vests it with discretion to “nip any potential conflict of interest in the bud” (Tucker v Shaw, 378 F2d 304, 307) and to prevent that actual or potential conflict of interest from interfering with and impeding the investigation.
The Sixth Amendment right to the “effective assistance of counsel” implies that a witness enjoying the advice of counsel necessarily enjoys counsel of his choice. “To impose counsel upon a witness against his will or arbitrarily to forbid him retaining a particular attorney unnecessarily obstructs his ability to enter private contractual arrangements for representation and would deprive him of his constitutional right to due process”. (See Matter of Taylor, 567 F2d 1183, 1186, n 1, and cases cited.)
“Effective assistance of counsel” also implies that such assistance shall be free of conflicts of interest that limit or diminish the quality of that legal representation. Indeed Canon 5 of the Code of Professional Responsibility enjoins a lawyer to “Exercise Independent Professional Judgment on Behalf of a Client” and EC 5-1 provides that “[t]he professional judgment of a lawyer be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.”
These aspirational ethical considerations are reflected in the mandatory Disciplinary Rules contained in the code. DR 5-105 relates to refusing to accept or continue employment if the interests of another client may impair the independent judgment of the lawyer and provides in DR 5-105 (A) that “A lawyer shall decline proffered employment *142 if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5-105(C).”
Multiple representation is permitted under DR 5-105 (C) “if it is obvious that [the lawyer] can adequately represent the interest of each [of the multiple clients] and if each [client] consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.”
Thus where an actual conflict of interest exists between multiple clients represented by a single lawyer, some courts have not hesitated to disqualify the attorney from such multiple representation. (Matter of Bronx County Grand Jury [Rodriguez], 102 Misc 2d 153; Pirillo v Takiff, 462 Pa 511; Matter of Gopman v Gopman, 531 F2d 262.) It is said however that an actual conflict of interest between two criminal defendants represented by a single lawyer can be waived by the clients (United States v Garcia, 517 F2d 272, 275; United States v Armedo-Sarmiento, 524 F2d 591), but that such a waiver must be an international relinquishment or abandonment of a known right and done with awareness of the relevant circumstances and likely consequences (Matter of Grand Jury, 446 F Supp 1132, 1139, supra). Some Federal courts adhere to the rule, in such situations, that “Whenever an individual asserts his rights [sic] to waive conflict free assistance, the court must conduct a hearing to determine the individual’s comprehension of the situation, its implications and whether the individual desires to proceed with the challenged counsel or with new counsel.” (Matter of Grand Jury, 446 F Supp 1132, 1139, citing United States v Mahar, 550 F2d 1005, 1009.) While our Court of Appeals has not apparently established this procedure as a requirement, it has nonetheless approved such an inquiry by a trial court, found a knowing waiver to have been made and refused to overturn a conviction later challenged on the basis of an alleged actual conflict. (See People v Gomberg, 38 NY2d 307, supra.)
*143 Analysis of the problem in respect to Grand Jury or other duly authorized investigations of criminal conduct indicates, however, that a waiver of an actual conflict should not be permitted.
At best it would be illusory since it “would be a rare defendant [or witness before a Grand Jury] who could intelligently decide whether his interests will be properly served by counsel who also represents another defendant [witness]” (United States v Carrigan, 543 F2d 1053, 1058; Matter of Grand Jury, supra).
Moreover, “A waiver by a witness of an actual conflict in multiple representation before the grand jury does not eliminate the conflict and if the court finds an actual conflict, it is at the same time finding that in some way that conflict has impeded the grand jury investigation. Disqualification will remove any possibility that the grand jury investigation is impeded because of the existence of an actual conflict in representation, and * * * in [such] situation preserving the public and potential criminal defendant’s Fifth Amendment right to a grand jury supersedes any rights of an individual to waive conflict free assistance of counsel under the Sixth Amendment.” (.Matter of Grand Jury, supra, at p 1140.)
In situations where only a potential, as opposed to an actual, conflict of interest is present, the Federal'courts hold that such potential conflict may be waived by the client, if it is established that the client has been fully apprised of the facts underlying the potential conflict, has been advised of the potential dangers of representation by counsel with a potential conflict of interest and given an opportunity to make inquiry concerning the nature and consequences of his legal representation and to express his views. A hearing should be held to inquire into these things and if the court is satisfied that the witness has voluntarily waived his Sixth Amendment protections by “ ‘clear, unequivocal and unambiguous language’ ” (United States v Garcia, 517 F2d 272, 278, supra; Matter of Taylor, 567 F2d 1183, supra; Matter of Grand Jury, 446 F Supp 1132, supra), the multiple representation will not be interfered with.
*144 In the case at bar, the Attorney-General contends that an actual conflict of interest exists in attorney respondent’s multiple representations which cannot be waived. Two of the witnesses, after having been granted immunity, have given testimony regarding sale of Ticketron tickets to the Broadway production that is apparently contradicted by other evidence uncovered by the investigation. Five others have claimed their privilege against self incrimination after having been given “target warnings”. Moreover, attorney respondent has asserted that no client will refuse to answer questions after being granted immunity, that “they have all been given target warnings. After having been given target warnings they asserted their Fifth Amendment privilege. That was the advice and discussion with each of them because each of them have been in that position.” (Emphasis added.)
The Attorney-General has revealed that ticket brokers have testified that they personally gave falsely completed money orders to box office staff members, who in turn gave large quantities of tickets to the brokers which were then scalped by the brokers. The brokers apparently admitted paying “ice” to the staff members who made the tickets available. Moreover, brokers have testified, in respect to the concerts, that they purchased the money orders used to pay for the tickets after the October 1 deadline and gave them to box office personnel in exchange for concert tickets.
Thus it is clear that there is a persuasive factual predicate for a belief that some of the box office personnel are implicated in unlawful practices regarding the sale and distribution of tickets at the arena box office. For each of them to demand a grant of immunity in exchange for his testimony effectively deprives the Attorney-General and the public of an opportunity to discover and prosecute the wrongdoers. By each of them claiming his Fifth Amendment privilege, on advice of counsel, these witnesses are effectively “stonewalling” and impeding the investigation. And while no inference of wrongdoing can be made from a witness’ assertion of his rights under the Fifth Amendment (see Grunewald v United States, 353 US 391; Matter of Gopman v Gopman, 531 F2d 262, supra), where the asser *145 tian of these rights effectively impedes a duly authorized investigation, the Sixth Amendment right to choice of counsel must give way to the States’ overriding right to uncover and prosecute wrongdoing.
A decision to extend or withhold a grant of immunity rests with the Attorney-General (General Business Law, § 399-i; CPL 50.20) and cannot be permitted to be controlled by an attorney’s advice to multiple clients with conflicting interests. No hearing is required in this circumstance since it is apparent that there is an actual conflict of interest that cannot be waived.
Accordingly the motion is granted and the attorney respondent is barred from any further representation of or rendering of legal assistance to any of the individual respondent employees, in connection with the subject investigation by the Attorney-General into the practices of the arena’s box office personnel in the sale and distribution of tickets.

 Because the proceeding before the Attorney-General is still in its preliminary *135 stages and because of the need to maintain the confidentiality of the investigation and protect the identity and reputations of the box office personnel, the record of this proceeding is ordered sealed and the caption amended to delete therefrom the names of the respondents.