**UNITED STATES of America, Appellee,**

v.

**Paul E. HORVATH, Jr., Robert M. Horvath, and Thomas O'Shaughnessy, Appellants.**

**Nos. 82–2321, 82–2322 and 82–2315.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 10, 1983.

Decided April 9, 1984.

---

558

James M. Rosenbaum, U.S. Atty., Daniel W. Schermer, Asst. U.S. Atty., D. Minn., Minneapolis, Minn., for appellee.

Mark W. Peterson and Thomas J. Flynn, Minneapolis, Minn., for appellant.

Before BRIGHT, JOHN R. GIBSON and FAGG, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Robert Horvath, Paul Horvath and Thomas O'Shaughnessy were convicted of conspiring to defraud the United States by evasion of income taxes in violation of 18 U.S.C. § 371 (1982). In addition, Paul Horvath was convicted of failure to file a 1975 income tax return and Robert Horvath was convicted of failure to file 1975, 1978 and 1979 income tax returns. On appeal all argue that the district court[1] improperly admitted evidence of an Ardmore, Oklahoma drug transaction at trial. The Horvaths additionally claim that the district court erroneously permitted Robert Malone, a lawyer, to testify as to information that they claim was privileged. O'Shaughnessy also argues that the court should not have admitted evidence that he drove a truck filled with marijuana from Massachusetts to Minnesota in 1975. We affirm the convictions.

The trial, essentially a "net worth/expenditures" tax prosecution, consumed nearly ten weeks. The government's theory was that the Horvaths were in the business of distributing marijuana shortly after January 1, 1975, through the end of 1979. In addition to failing to report income from this illegal venture, the Horvaths allegedly made various purchases with cash through other parties under fictitious names, or through corporations, to conceal both their income and its sources. Evidence implicated O'Shaughnessy, a licensed real estate broker, in at least two of these transactions, one involving an oil company in which the Horvaths invested $25,000 and another regarding the purchase of a home by Robert Horvath. Cashier's checks, naming allegedly fictitious remitters, were used in both transactions.

---

1. The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota.

None of the appellants contest the sufficiency of the evidence; the only issues before us involve the admissibility of certain evidence. We will recite only the evidentiary background necessary to decide these claims of error and will not concern ourselves further with a lengthy story that includes marijuana trafficking, shipments from Colombia, and the details of numerous cash purchases claimed to have been made by the Horvaths.

*Ardmore evidence.* All appellants claim error in the admission of evidence concerning a marijuana seizure at the Ardmore, Oklahoma airport on December 30, 1976. The police seized two aircraft and four trucks, which contained 17,000 pounds of marijuana, and arrested the occupants. An Ardmore cab driver testified that she had picked up a passenger described as about twenty-five years old with brown curly hair and a mustache at about 9:00 a.m. that day, or seven hours after the marijuana seizure. He had fresh scratches on his face, was not dressed appropriately for the weather, and wanted to go to Oklahoma City, a fifty-dollar fare and 90 to 95 miles away. She was shown photostatic copies of three pictures of Paul Horvath two weeks before her testimony and again two days before her testimony. At first she stated that she could not identify anyone, but on further prompting pointed out Paul Horvath as the person who looked like the man in her cab that day. [TR V, 49–54] Her direct testimony was further qualified on two occasions with the statement, "I ain't for sure now," a reservation which she also expressed on cross-examination. [TR V, 49–51] Apart from the cab driver testimony, there was also evidence that O'Shaughnessy had been at an Ardmore motel two months before the marijuana seizure.

Appellants contend that the evidence linking them to the Ardmore incident was improperly admitted as it constituted evidence of other crimes under Fed.R.Evid. 404(b). The government counters this contention by arguing that proof of the Ardmore seizure was necessary and relevant to show a "likely source" of the Horvaths'

taxable income and O'Shaughnessy's connection to it as well.

▆▆▆▆ In reviewing the admissibility of "other crimes" evidence under Rule 404(b), this Court must determine whether the district court abused its discretion. *United States v. Moss*, 544 F.2d 954, 960–61 (8th Cir.1976), *cert. denied*, 429 U.S. 1077, 97 S.Ct. 822, 50 L.Ed.2d 797 (1977); *United States v. Marshall*, 683 F.2d 1212, 1215 (8th Cir.1982). To be admissible such evidence must meet four requirements:

> (1) the evidence of the bad act must be admissible on a material issue raised;
>
> (2) the evidence must be similar in kind and reasonably close to the charge at trial;
>
> (3) the evidence of the other crime or bad act must be clear and convincing;
>
> (4) the probative value of the evidence must not be outweighed by its prejudice.

*Marshall*, 683 F.2d at 1215. We conclude that the Ardmore evidence was improperly admitted; such evidence had little probative weight and did not connect any of the appellants to the Ardmore incident by clear and convincing evidence.

▆▆▆▆ For the same reasons, however, the record clearly reveals that any error in admitting evidence of the Ardmore incident was harmless. "[I]t is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations . . . ." *United States v. Hasting*, 461 U.S. 499, ——, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96, 106 (1983). The Ardmore cab driver identified Paul Horvath very tentatively and only after some prompting. The cab driver's testimony that she would have to see the individual in person to give an identification negates any conclusion of improper suggestiveness. Moreover, Paul Horvath was acquitted of the tax charges for 1976, a fact that suggests that the jury accorded little, if any, weight to the Ardmore evidence. We conclude that the weak identification, which would at most establish a tenuous evidentiary link, in the context of a trial lasting nearly ten weeks, did not prejudice Paul Horvath. For the same

reasons, such evidence did not prejudice either Robert Horvath, as to whom no Ardmore evidence was adduced, or O'Shaughnessy, as to whom there was only proof that he stayed at an Ardmore motel two months earlier. Considering the weight of the other evidence in this lengthy trial supporting appellants' convictions, we are satisfied beyond a reasonable doubt that admission of the Ardmore evidence was harmless. *United States v. Wentz,* 686 F.2d 653, 658 (8th Cir.1982); *United States v. Ogle,* 587 F.2d 938, 941 (8th Cir.1978).

*Attorney-client privilege.* The Horvaths contend that the testimony of Robert Malone was admitted into evidence in violation of their assertion of the attorney-client privilege. Malone had acted as a lawyer for the Horvaths. He was charged and tried with the Horvaths and O'Shaughnessy but was acquitted. Malone testified that the Horvaths had approached him for the purpose of retaining his services. After inquiring as to the confidentiality of their conversations and documents and receiving assurances from Malone, Paul had told Malone about his previous activity in the marijuana business but that he was no longer involved and did not intend to involve Malone in any illegality. It was agreed that the Horvaths' files would be physically separate from Malone's other files and that the files would remain the property of the Horvaths. During the course of the representation Malone conducted various financial transactions on behalf of the Horvaths and knew that a great deal of the funds probably came from illegal business. [TR VIII, 31–32, 57–59, 116]

Before admitting Malone's testimony, the district court conducted an *in camera* hearing after some four weeks of trial and concluded that the record and the *in camera* hearing "establishes a prima facie showing that the alleged privileged communications were made in furtherance of the conspiracy charged in the indictment and therefore are not privileged." The court overruled the Horvaths' objections to the introduction of this testimony. We cannot conclude that the court abused its discretion in admitting this testimony.

Initially we observe that while Malone performed some legal services for the Horvaths, his handling of their funds was, by his own admission, "just a service that I could provide my clients." Before Malone had even learned that he had passed the bar examination, Robert Horvath, his high school classmate, had contacted him concerning a $30,000 loan to the owner of Spanky's Saloon. Malone was retained to collect the loan payments on Robert's behalf and place them in a savings account, which neither specified that it was a trust account nor identified the beneficiary. Furthermore, the second mortgage securing the loan was never recorded. Malone's services here, specifically in drafting documents, were, at least in part, legal in nature. Thereafter Paul brought Malone two checks, the proceeds of gold transactions, and Malone deposited them in two separate trust accounts, which made no reference to the Horvaths. On several occasions Malone withdrew cash from these trust accounts and delivered it to Paul. Malone admitted that he functioned primarily as a courier. At one point Malone asked about the source of a check, to which Paul responded by asking if he needed to know; Malone did not pursue the subject further.

 The attorney-client privilege extends only to confidential communications made for the purpose of facilitating the rendition of *legal* services to the client. *In re Malone,* 655 F.2d 882, 886 (8th Cir.1981). Thus, where the attorney acts merely as a conduit for the client's funds, *Morgan v. United States,* 380 F.2d 686, 693 (9th Cir. 1967), *cert. denied,* 390 U.S. 962, 88 S.Ct. 1064, 19 L.Ed.2d 1160 (1968); as a scrivener for the client, *Canaday v. United States,* 354 F.2d 849, 857 (8th Cir.1966); or as a business adviser, *Colton v. United States,* 306 F.2d 633, 638 (2d Cir.1962), *cert. denied,* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963), the privilege is inapplicable. To the extent Malone's services to the Horvaths took the form of transferring funds and facilitating transactions, they were not privileged.

The claims of privilege relating to the Horvaths' discussions with Malone on confidentiality and past unlawful acts raise different considerations. Generally, it is well established under common law that confidential communications between an attorney and a client are privileged and not subject to disclosure absent consent of the client. *In re Berkley & Co., Inc.*, 629 F.2d 548, 552 (8th Cir.1980). It is equally well-established, however, that attorney-client communications lose their privileged character when the lawyer is consulted to further a continuing or contemplated criminal or fraudulent scheme, not solely with respect to past wrongdoing. *Id.* at 553; *In re Murphy*, 560 F.2d 326, 337 (8th Cir. 1977). To overcome a claim of privilege using the "crime-fraud" exception, the government must merely make a prima facie showing that the legal advice has been obtained in furtherance of an illegal or fraudulent activity. *Clark v. United States* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933); *Berkley,* 629 F.2d at 553. Whether the attorney is ignorant of the client's purpose is irrelevant. *United States v. Calvert,* 523 F.2d 895, 909 (8th Cir.1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976). A district court's determination that such a prima facie showing has been made may not be overturned absent an abuse of discretion. *Berkley,* 629 F.2d at 553.

We first examine the Horvaths' communications with Malone expressing a desire that their files be strictly confidential and physically separate from others of Malone, and that they remain the Horvaths' property. A client's desire that a lawyer safeguard the confidentiality of the client's business matters is understandable, as well as inherent in their relationship. The district court, however, was entitled to evaluate the legitimacy of the Horvaths' confidentiality concerns in the context of the entire series of transactions involving Malone. Malone's services to a great extent involved conducting transactions on behalf of the Horvaths that would shield their business transactions and keep secret the sources of their funds. While Malone denied that he intended to launder the funds, he admitted that this was the effect of his actions with the trust accounts. Hence the district court could conclude that the Horvaths' inquiries as to confidentiality were made in furtherance of fraud or crime.

The Horvaths also argue that what they told Malone about their past marijuana trafficking was inadmissible. Ordinarily disclosures of past wrongdoing are shielded by the attorney-client privilege. *In re Murphy,* 560 F.2d at 337. We do not, however, have a case where the Horvaths had sought Malone's counsel concerning legal problems relating to those past activities. Here again, it is evident that the Horvaths desired far more from Malone than simply legal services. Malone was asked to undertake frequent financial transactions, including the establishment of accounts and the delivery to the Horvaths of cash sums as large as $6,000 from the bank. He admitted knowing that the source of the funds may have been the earlier illegal activities. Malone's testimony made clear that he nevertheless continued to perform services for the Horvaths that would conceal the ownership, source and disposition of these funds. The district court could justifiably conclude from this record that the primary purpose of the Horvaths' relationship with Malone was to conceal from the government the extent of their financial holdings and their sources of income, thus facilitating an *ongoing* criminal conspiracy.

Thus, neither the Horvaths' express desire for strict confidentiality nor the fact that Malone testified as to past activities automatically invokes the protection of the attorney-client privilege. We cannot view these factors in isolation; both blend inseparably with the non-legal services that Malone was called upon to perform as well as with the particular manner in which he was to handle those that were legal. We cannot conclude that the district court abused its discretion in admitting these conversations between the Horvaths and Malone.

We also observe that there was abundant evidence in the record other than the testimony of Malone to establish that the Horvaths had been heavily involved in an earlier million-dollar marijuana transaction. Direct evidence revealed that the Horvaths delivered forty thousand dollars in cash to one Dawson, in connection with the delivery of a large shipment of marijuana to Folly's Cove, Massachusetts. Paul Horvath was present in Massachusetts to discuss this transaction and was introduced as a Minneapolis distributor. Even if there was error in the admission of Malone's testimony in this respect, any error was harmless. *Hasting*, 461 U.S. at ——, 103 S.Ct. at 1980, 76 L.Ed.2d at 106.

*Marijuana truck evidence.* The indictment alleged and evidence was adduced to show that O'Shaughnessy, on behalf of the Horvaths, drove a truck containing a large quantity of marijuana from Massachusetts to Minnesota in 1975. O'Shaughnessy advances two arguments in claiming that such evidence concerning his participation in a drug transportation conspiracy was inadmissible to support his conviction of conspiring to defraud the United States of income taxes.

First, O'Shaughnessy contends that such evidence was irrelevant because the evidence pertained to a crime different from that charged. O'Shaughnessy relies upon *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and *United States v. Jackson*, 696 F.2d 578 (8th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983), both of which involved proof of conspiracies completely unrelated to those charged. He argues that the drug conspiracy was completely separate and distinct from the tax conspiracy. O'Shaughnessy further argues that under *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the district court improperly permitted the jury to construe concealment of the Horvaths' drug conspiracy, by not declaring their drug income, as a continuation of that drug conspiracy.

While the evidence did show O'Shaughnessy's participation in a drug conspiracy not charged in the indictment, it also demonstrated his knowledge of and involvement in the concealment of the Horvaths' drug income, a separate and distinct conspiracy. As the Supreme Court declared in *Ingram v. United States*, 360 U.S. 672, 679–80, 79 S.Ct. 1314, 1320, 3 L.Ed.2d 1503 (1959):

A conspiracy, to be sure, may have multiple objectives, . . . and if one of its objectives, even a minor one, be the evasion of federal taxes, the offense is made out, though the primary objective may be the concealment of another crime. [citations omitted.]

*See also Anderson v. United States*, 417 U.S. 211, 226, 94 S.Ct. 2253, 2263, 41 L.Ed.2d 20 (1974) ("A single conspiracy may have several purposes, but if one of them—whether primary or secondary—be the violation of a federal law, the conspiracy is unlawful under federal law.") Thus, the evidence was not irrelevant to show that O'Shaughnessy participated in the tax conspiracy even though the primary conspiracy may have been a drug conspiracy.

Second, O'Shaughnessy argues that the evidence constituted "other crimes" evidence barred by Fed.R.Evid. 404(b), and that he was substantially prejudiced both by its admission and by the absence of limiting instructions. Rule 404(b), however, permits admission of such evidence to show, *inter alia*, intent and knowledge. Applying the standard governing the admission of "other crimes" evidence set forth *supra*, we conclude that the district court did not err in admitting the evidence.

Accordingly, we affirm the convictions of all three appellants.