**In re GRAND JURY SUBPOENA**
GJ2/00–345.

No. M–1–39.

United States District Court,
S.D. Iowa.

Nov. 27, 2000.

Andrew H. Kahl, Assistant United States Attorney, Des Moines, IA, for Plaintiff.

James F. Whalen, Iowa Federal Public Defender, Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Before the Court is Arnold Goldstein's Supplemental Motion to Quash and Request for Additional Time for Further Responsive Pleadings. The basis of Arnold S. Goldstein's ("Goldstein") motion to quash his subpoena is that any information Goldstein has about Defendant is protected by the attorney-client privilege. Goldstein also requested additional time so that Defendant could obtain Iowa counsel to represent him on the matter.

In response to Goldstein's motion the Government filed a memorandum of law supporting its opposition to Goldstein's motion. The Court held a hearing on the matter on Monday, November 20, 2000. Following the hearing, the Court conducted an *in camera* review of Goldstein's file and a summary of evidence provided by the United States Attorney's office. Then, before the Court could render a decision on Goldstein's motion, Defendant obtained Iowa counsel. Defendant's new counsel contacted the Court to allow him to make a record on the matter. The Court granted counsel's request, and at the second hearing on the matter Defendant waived any attorney-client privilege with respect to Arnold S. Goldstein's testimony and production of documents.

## I. Background

The pending grand jury investigation is in regard to Scott Williams Hinkley, Sr. ("Hinkley"). Hinkley operated two companies called Iowa Rural Housing, Inc. and Missouri Rural Housing, Inc. Hinkley got people to invest in these companies by promising them returns from 33% to 59% and representing that the purpose of the companies was to "pursue 'the purchase, ownership, development, rehabilitation and management of affordable rural housing, and generally to make such housing available in rural areas of Iowa.' "[1] He received a large influx of investment capital between late 1999 and the early part of 2000. And on the week of July 17, 2000, when the most recent dividends were due, none of the approximately 200 investors received them. Hinkley was reported missing by his family on July 2, 2000. An investigation revealed that Hinkley purchased a $1.3 million yacht in Ft. Lauderdale, Florida. Authorities arrested him in St. Maarten. He has already been indicted on nine counts of mail fraud, six counts of money laundering, and one count of forfeiture.

Goldstein is an attorney specializing in domestic and offshore asset protection. The Government alleges that Hinkley used Goldstein's services to help him launder money. The Government points out the following. Prior to his disappearance, Hinkley was reading a book written by Goldstein entitled, *Offshore Havens ... and other safe places to keep your money in unsafe times.* The book explains how an individual can utilize offshore banks and corporations to hide money. Also prior to his disappearance, Hinkley made comments to his wife about there being 700 uninhabited islands in the Carribean, how a person could put money in offshore accounts, and how the "mob" launders money through offshore accounts. After Hinkley's disappearance, a blue note pad was found in Hinkley's Oskaloosa, Iowa office

---

1. Memo. in Supp. of Govt.'s Opp. to Mot. to    Quash Grand Jury Subpoena at 5.

containing the notations, "Antigua," "Bahamas," and another island, along with apparent directions to Goldstein's office in Florida. Goldstein admits that Hinkley was a client of his.

In addition, a grand jury subpoena to OCS, Inc. (Offshore Consulting Services) produced the following information. Goldstein hired OCS, Inc. to incorporate a Nevada corporation for Hinkley in the name of Savoy Enterprises, Inc. Bank statements reveal that on June 12, 2000, $9,732.32 was wired to the Savoy Enterprises, Inc. account at the Bank of America from Iowa Rural Housing, Inc. A "Stock Ledger Statement of Savoy Enterprises, Inc." stated that the custodian of the company's stock ledger was the Nevis American Trust Company, located in Charlestown, Nevis, West Indies. Finally, an invoice sent by OCS, Inc. to Goldstein and his firm referenced work done on behalf of Hinkley. This invoice indicates that OCS, Inc. chartered a new Nevada corporation, provided nominee officer services, set up a bank account for the corporation, made the opening deposit, and had agreed to manage the bank account.

The Government subpoenaed Goldstein to testify before the grand jury in hopes that Goldstein's testimony would lead to more money laundering charges and the information necessary to track down and seize more of Hinkley's assets. Goldstein moved to quash the subpoena on the grounds that the communications between he and Hinkley are protected by the attorney-client privilege. Goldstein also moved for additional time to respond to the subpoena so that Hinkley could get Iowa counsel to represent him. Since Goldstein's motion, Hinkley has obtained Iowa counsel, and that counsel has been allowed the opportunity to make a record on this matter.

## II. Discussion

The subpoena issued to Goldstein ordered him to appear before the grand jury and provide "[c]opies of any and all documents, records, data, or information in any form (including documents or electronic form) relating to Scott W. Hinkley, Sr., Iowa Rurual Housing, Inc., Missouri Rural Housing, Inc., and any other business associated with Scott W. Hinkley, Sr." To assist Goldstein in preparing for his testimony before the grand jury, the Government sent him a letter informing him that it wished to ask him the following questions (along with appropriate follow up questions regarding the same subject matter):

(1) When did Scott Williams Hinkley, Sr., initially contact your firm?

(2) For what purpose did he consult you?

(3) Did you ever meet with Scott Williams Hinkley, Sr.? If so, when and for how long?

(4) How many telephone conversations did you have with Mr. Hinkley? When did you have each conversation and what was discussed?

(5) Did you assist Mr. Hinkley in chartering any corporations? What are the names of these corporations and what are the states of incorporation?

(6) Did you assist Mr. Hinkley in opening any bank accounts, either in the United States or in a foreign country? Please list the banks, the account numbers, and the account holder's name.

(7) Did Mr. Hinkley tell you anything about his business? What did he say?

(8) Were you aware that the money Mr. Hinkley used to make the deposits into these bank accounts was money he obtained from investors and that he had not used the money as represented?

The Court ordered Goldstein to produce a copy of his file on Hinkley for an *in camera* review in order to determine what services Goldstein provided Hinkley.

■ Defendant's waiver of the attorney-client privilege resolves Goldstein's motion.

The attorney-client privilege belongs to the client, not the attorney, and it is thus the client's to waive. *See Henderson v. United States*, 815 F.2d 1189, 1192 (8th Cir.1987) (noting that "the attorney-client privilege belongs to and exists solely for the benefit of the client"); *United States v. Horvath*, 731 F.2d 557, 562 (8th Cir.1984) ("Generally, it is well established under common law that confidential communications between an attorney and a client are privileged and not subject to disclosure absent consent of the client.") (citation omitted). However, even if Defendant had not waived the attorney-client privilege, the information sought by the Government would not be protected anyway.

■ After an *in camera* review of Goldstein's file on Hinkley and a summary of evidence provided by the United States Attorney's office, the Court finds that the information contained in Goldstein's file on Hinkley is not protected by the attorney-client privilege. Goldstein's file shows that he provided a mixture of business and legal services to Hinkley. "The attorney-client privilege extends only to confidential communications made for the purpose of facilitating the rendition of legal services to the client. Thus, where the attorney acts merely as a conduit for the client's funds, as a scrivener for the client, or as a business adviser, the privilege is inapplicable." *United States v. Horvath*, 731 F.2d 557, 561 (8th Cir.1984) (internal citations omitted). Accordingly, any business services Goldstein provided to Hinkley are not privileged.

■ The legal services Goldstein provided to Hinkley are not protected by the attorney-client privilege either. Attorney-client communications that are intended to further a continuing or contemplated criminal or fraudulent scheme that is yet to be performed are not privileged. *Id.* (citations omitted); *In re Grand Jury Proceedings Involving Berkley*, 629 F.2d 548, 555 (8th Cir.1980) (citations omitted). "To overcome a claim of privilege using the 'crime-fraud' exception, the government must merely make a prima facie showing that the legal advice has been obtained in furtherance of an illegal or fraudulent activity. Whether the attorney is ignorant of the client's purpose is irrelevant." *Horvath*, 731 F.2d at 562 (internal citations omitted). Goldstein's file on Hinkley basically contains the following: (1) a letter from Hinkley to Goldstein outlining his goals for their relationship[2]; (2) notes from someone in Goldstein's office indicating among other things that Hinkley is planning a divorce and has approximately $300,000 to $400,000 to invest; (3) corporate charters for two Nevis corporations and one Nevada corporation; (4) documents tying Hinkley to those corporations; (5) bank account information relating to the corporations; (6) documents regarding Nevis American Trust; and (7) documentation of Goldstein's attempts to contact Hinkley after Hinkley's arrest and Goldstein's receipt of the subpoena. Based on the facts as laid out above, the United States Attorney's office has met its burden of showing that Goldstein's services to Hinkley were for the purpose of helping Hinkley launder money. Therefore, Goldstein must appear before the grand jury as scheduled, answer the questions relating to the information Goldstein that was provided to the Court, and produce copies of the documents that were provided to the Court.

At the first hearing on this matter, the Government demonstrated that time was of the essence. Hinkley, although he is currently in custody, could still be moving his assets either directly by himself or

---

2. In his letter, Hinkley first conspicuously notes that he has no desire to "abrogate the laws of any country." Hinkley then goes on to lay out the following goals for his relationship with Goldstein: "(1) An offshore account(s) to which I have exclusive knowledge and control; (2) The ability to hold real assets offshore; (3) To own and actively manage an Internet business in an unregulated environment; and (4) To complete this process as quickly and expeditiously as possible."

**780**

indirectly through a cohort. Goldstein could provide information that would allow the Government to track down and seize some of these assets. Hinkley's new counsel was given the opportunity to make a record at a second hearing on this matter, though admittedly on short notice. Regardless, at that hearing Hinkley waived any attorney-client privilege that might exist. Thus, there is no reason to delay these proceedings any further.

### III. Conclusion

Goldstein's Supplemental Motion to Quash and Request for Additional Time for Further Responsive Pleadings is **denied.**

**IT IS SO ORDERED.**