In the
United States Court of Appeals
For the Seventh Circuit

No. 01-3975

United States of America,

Plaintiff-Appellee,

v.

Bogdan Gajo,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 100--Joan B. Gottschall, Judge.

Argued April 9, 2002--Decided May 20, 2002


   Before Flaum, Chief Judge, and Coffey and
Kanne, Circuit Judges.

   Flaum, Chief Judge.  A jury convicted
Defendant-Appellant Bogdan Gajo of
conspiracy to commit arson in violation
of 18 U.S.C. sec. 371, solicitation to
commit arson in violation of 18 U.S.C.
sec. 373, arson in violation of 18 U.S.C.
sec. 844 (I), and mail fraud in violation
of 18 U.S.C. sec. 1341. Gajo appeals his
conviction, challenging two evidentiary
rulings related to the admission of tape
recorded statements and a witness's grand
jury testimony. For the reasons stated
herein, we affirm.

I.  Background

   Gajo owned a business called Cragin
Sausage, which sold specialty ethnic
foods, beverages and cigarettes./1
OnJanuary 16, 1996, the building where
Cragin Sausage was located caught fire
and burned moderately. The fire was
concentrated in the rear kitchen and
storage area of Cragin Sausage. After the
fire was safely extinguished, Daniel
Cullen, who worked in the Fire
Department's Office of Fire
Investigation, examined the property and
concluded that the fire was deliberately
set. Traces of gasoline were present in
debris samples taken from the scene, even
though there was no gasoline present in

the store prior to the fire. In addition, Cragin Sausage's rear southwest door, which was the only door open at the time of the fire, exhibited marks indicating that the locks had been pried off from the inside in an attempt to simulate a forced entry. Three separate experts who testified at trial reached this conclusion: John Marcus, a private fire investigator hired by one of Gajo's attorneys; Mark Boese, a forensic scientist hired by Gajo's insurance company; and Cullen. Only Gajo and his girlfriend, Maria Grazina Curylo, had keys to Cragin Sausage. They were also the only two people who knew the code to the store's security system, which never activated during the fire. Approximately one week after the fire, Gajo submitted an insurance claim for the damage at Cragin Sausage. Gajo later submitted a proof of loss. The insurance company eventually denied Gajo's claim, although the record is unclear regarding the exact timing--a circumstance that will have some import in our later discussion.

During the arson investigation, government agents examined Cragin Sausage's outgoing telephone records, which led them to an individual named Jay Smith. Agents questioned Smith, who ultimately agreed to cooperate with the government. Smith recounted that in December 1995, a former coworker named Edward Baumgart approached Smith at his place of employment (the Banks Grill) and introduced him to Gajo. According to Smith, Baumgart told him that "Gajo needed a building burned down." Smith also stated that although Gajo spoke almost exclusively in Polish, Gajo told him in English that burning down Cragin Sausage "was urgent." Gajo and Baumgart offered Smith $4,000 to set fire to Cragin Sausage, but Smith declined.

Further investigation led agents to several real estate agents, who testified that Gajo listed the Cragin Sausage property for sale and that Gajo was desperate to sell his business to obtain money. Indeed, one agent testified that Gajo told him he wanted to sell Cragin Sausage due to a lack of business./2 After the agent failed to sell the property despite lowering the price, Gajo suggested that the agent burn down Cragin Sausage so Gajo could obtain the insurance proceeds. The government also

presented evidence describing statements Gajo made to investigators that were inconsistent with eyewitness testimony. Following the fire, Gajo told both Cullen and an Alcohol, Tobacco and Firearms ("ATF") agent that he left Cragin Sausage on Sunday afternoon at approximately 4:00 p.m. for a short vacation and that he did not return to the store until after it caught fire on Tuesday morning. However, two neighbors testified that they saw Gajo at Cragin Sausage on the day before the fire. One witness observed Gajo loading what appeared to be boxes of liquor into the back of a minivan. Gajo had also told investigators that liquor was one of the classes of merchandise missing from Cragin Sausage.

Approximately 10 months after the fire, Smith contacted Baumgart at the direction of a federal ATF agent. Smith and Baumgart engaged in two conversations, each of which was recorded and ultimately introduced into evidence. On the first tape, Baumgart responds to Smith's probing about what he should say to an agent questioning him about the fire at Cragin Sausage. Baumgart instructs Smith to tell the investigating officer "to fuck off." In the second conversation, which occurred several minutes later, Baumgart admits introducing Gajo to Smith, but states that he does not know who burned Cragin Sausage:

SMITH: This guy you introduced me to.

BAUMGART: Uh huh.

SMITH: . . . is he going to put me in a bad spot?
BAUMGART: He's not going to put you in a bad spot, because if he would he's gonna go to jail. OK.

SMITH: Alright. OK. Alright.

BAUMGART: Cause right now he doing all he can to get--

SMITH: . . . for my benefit what was this asshole's name?

BAUMGART: Gajo.

SMITH: Gajo, alright.

BAUMGART: G, A, J, O.

SMITH: Alright.

BAUMGART: Bogdan.

Later in the second tape, Baumgart further instructed Smith about how to respond if investigating agents asked who set the fire. Baumgart stated, "Well, you, you, you weren't there. I wasn't there." Baumgart also told Smith, "You don't know a motherfuckin thing. Neither do I."

At trial, Smith described his meeting with Baumgart and Gajo at the Banks Grill. During Smith's cross-examination, defense counsel established that Smith could not remember if Gajo said anything to him in English. Smith made this admission despite testifying on direct that Gajo said in English that burning down Cragin Sausage was urgent. The government addressed the issue on redirect, but Smith still could not recall Gajo's precise words. The government, over defense counsel's objection, then moved to admit Smith's grand jury testimony as substantive evidence. The district court ruled that Smith's lack of memory as to what Gajo said at the Banks Grill meeting was inconsistent with his grand jury testimony and admitted the transcripts. The portions of the grand jury testimony read to the jury revealed that Gajo directly solicited Smith's assistance, that Gajo asked him in English to help find someone to "torch" his business for the "insurance money," and that Gajo told Smith it was important that somebody burn down Cragin Sausage. The jury convicted Gajo, and Gajo appeals.

II. Discussion

In this appeal, Gajo challenges two of the district court's evidentiary rulings: the decision to admit the tape recorded conversations between Baumgart and Smith, and the decision to admit as substantive evidence Smith's grand jury testimony. We review the district court's evidentiary rulings for an abuse of discretion. United States v. Smith, 230 F.3d 300, 307 (7th Cir. 2000). Even if a ruling is erroneous, we will not overturn it unless it is likely that the decision had "a substantial influence over the jury." Palmquist v. Selvik, 111 F.3d 1132, 1339 (7th Cir. 1997). Because of the special

deference we give to the trial judge's evidentiary rulings, we will not reverse unless the record contains no evidence on which the trial judge rationally could have based its decision. United States v. Walton, 217 F.3d 443, 449 (7th Cir. 1999).

### A. Tape Recorded Conversations

Gajo first argues that the district court erred in admitting the tape recorded conversations between Baumgart and Smith because those conversations do not fall within the definition of nonhearsay related to statements made by a coconspirator. Federal Rule of Evidence 801(d)(2)(E) provides that a statement is admissible and not hearsay if it is made "by a coconspirator of a party during the course and in furtherance of the conspiracy." To justify admission of coconspirator statements under FRE 801(d)(2)(E), the government must present evidence that a conspiracy was in progress at the time of the conversation and that the statements were made "in furtherance of" the conspiracy. United States v. Curtis, 37 F.3d 301, 307 (7th Cir. 1994). Gajo contends (1) that there was no conspiracy in progress at the time the recordings were made because the conversations took place approximately 10 months after the fire, (2) that the statements made on the tape recordings were not in furtherance of the conspiracy because the conversations' content was not related to obtaining insurance proceeds, and (3) that Smith's statements should not have been admitted in any event because he was never a member of the conspiracy. In response, the government maintains that Gajo's counsel waived any objection to the admission of the tape recorded conversations. In the alternative, the government argues that sufficient evidence existed to establish that the conspiracy was ongoing and that Baumgart made the statements in furtherance of that conspiracy.

The government's waiver argument requires further explanation. In pretrial motions, the parties disputedwhether the tape recorded conversations were admissible. The government submitted a written Santiago proffer, in which it set forth the facts supporting the admission of the tape recorded conversations pursuant to Rule

801(d)(2)(E). After extensive briefing, the district court issued a written order finding the tapes admissible. At trial, the government moved to admit the tape recorded conversations between Baumgart and Smith, the district court inquired whether Gajo had an objection, and defense counsel responded "no." The government now argues that defense counsel's affirmative response constitutes waiver on appeal.

Resolution of this issue depends upon whether the district court's written order was a definitive ruling. In Wilson v. Williams, we considered whether an objection at trial always is necessary after an adverse ruling on a motion in limine. We concluded that "a definitive ruling in limine preserves an issue for appellate review, without the need for later objection--but this is just a presumption, subject to variation by the trial judge, who may indicate that further consideration is in order." 182 F.3d 562, 563 (7th Cir. 1999); see also Fed. R. of Evid. 103 (2002) ("Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."). Williams defined a definitive ruling as one that does not require further consideration and that does not depend on how the trial proceeds. 182 F.3d at 566. In contrast, Williams described a conditional ruling as one that has effect only after a certain condition is satisfied. Id. at 565. As an example, we cited a situation where the district court states that "if a litigant testifies, then the adverse party will be entitled to cross-examine in such-and-such a way. Until the condition has been satisfied by the testimony, the ruling has no effect." Id.

In this case, the government maintains that the district court's decision was conditional because the tape recorded conversations were only admissible if the government met the foundational requirements of FRE 801(d)(2)(E), i.e., only if the government proved that a conspiracy existed, and Baumgart and Smith made the statements in furtherance of the conspiracy. We disagree. Under the government's reasoning, all pre-trial decisions would be considered

conditional, rendering the reasoning of Williams and Rule 103 inapposite. A district court always decides motions in limine based upon representations made by the parties concerning what the evidence at trial will be, and every decision depends--at least to some degree--on how the evidence at trial unfolds. As a result, a more appropriate inquiry is whether the district court's written order in this case definitively settled the issue of admissibility, and we believe that it did. Indeed, after finding the tape recorded conversations generally admissible, the district court held a subsequent hearing to determine whether any portions should be redacted and whether the statements were unduly prejudicial under Federal Rule of Evidence 403. Thus, the district court prepared the transcripts for admission--a decision that depended on the government's evidence at trial only in the sense that the evidence be the same as that set forth in the Santiago proffer. We therefore find that Gajo preserved the issue for appellate review.

With respect to the merits, we believe the district court properly admitted the tape recorded conversations between Baumgart and Smith. As discussed above, a statement is not hearsay and admissible under FRE 801(d)(2)(E) if it is made by a coconspirator "during the course and in furtherance of the conspiracy." To be admissible, then, the government must establish by a preponderance of the evidence two requirements: (1) a conspiracy existed at the time of the statements between the defendant and the declarant, and (2) the statements contributed to the ultimate goal of the conspiracy. Bourjaily v. United States, 483 U.S. 171, 175 (1987); United States v. Hunt, 272 F.3d 488, 497 (7th Cir. 2001). In this case, Gajo challenges whether a conspiracy existed after the fire at Cragin Sausage and whether the statements were "in furtherance of" the conspiracy's ultimate criminal objective.

We first address whether the conspiracy existed at the time of the tape recorded conversations. By the time Smith contacted Baumgart at the behest of an ATF agent, ten months had passed since the fire at Cragin Sausage. Relying on Grunewald v. United States, 353 U.S. 391, 405 (1957), and its progeny, Gajo argues

that the time lapse between the fire and the statements rendered the conspiracy to commit arson complete at the time of the Baumgart-Smith conversations. Grunewald held that the act of concealment typically is not part of a conspiracy's primary criminal objective. Once the coconspirators achieve the goals of the conspiracy, statements concerning acts of concealment (or to avoid punishment) are generally inadmissible. Id. at 405-06. However, this principle does not extend easily to the arson-for-profit context. In United States v. Xheka, 704 F.2d 974, 986 (7th Cir. 1983), we held that the primary goal of a conspiracy involving arson is not only to destroy a building by fire, but also to obtain the insurance proceeds. In other words, unlike most other criminal conspiracies, concealment is actually one of the main criminal objectives of an arson-for-profit scheme, because it facilitates the primary objective of fraudulently acquiring insurance proceeds. Id. at 986 ("The conspiracy continues until defendants obtain the insurance money or abandon their quest."); see also United States v. Doyle, 771 F.2d 250, 255-56 (7th Cir. 1985); United States v. Zabic, 745 F.2d 464, 473 (7th Cir. 1984).

Based on the foregoing, resolution of this issue would be clear except for one additional factor. The record in this case does not reveal when Gajo's insurance company denied his claim or whether the claim remained pending at the time of the Baumgart-Smith statements. Despite this absence, there was sufficient evidence to find that the conspiracy to obtain insurance proceeds was ongoing 10 months after the fire. First, in August 1996, Gajo gave deposition testimony in a civil lawsuit related to the fire at Cragin Sausage and Gajo's insurance claims. Second, Baumgart made at least one statement in October 1996--"it looks like the fuckin' case is still going on"--that suggests the conspiracy was ongoing. Third, there is no dispute that at the time of the October 1996 conversations, "Gajo had not yet received [the] insurance proceeds." United States v. Gajo, No. 98 CR 100, at 5 (N.D. Ill. May 20, 1999) (R. 38 at 5). In contrast, the only evidence that the conspiracy had ended was the parties' stipulation that the insurance company had denied Gajo's claim sometime after he

submitted a proof of loss on July 3, 1996./3 But this stipulation lacked a specific date, rendering it irrelevant to the question of whether the conspiracy existed at the time of the tape recorded conversations. From this evidence, the district court was within its discretion to conclude that a conspiracy still existed at the time of the Baumgart-Smith conversations.

We next address whether Baumgart's statements were "in furtherance of" the conspiracy--an inquiry that requires examination of the statements' content. We consider statements to be "in furtherance of" the conspiracy when they promote the conspiracies objectives, Bourjaily, 483 U.S. at 175, i.e., when the statements are "part of the information flow between conspirators to help each perform a role." Hunt, 272 F.3d at 495 (quoting United States v. Johnson, 927 F.2d 999, 1002 (7th Cir. 1991)). In this case, Gajo objects to the admission of two statements, each of which relates to Baumgart's attempts to instruct Smith to remain quiet about the meeting between Baumgart, Smith and Gajo. Gajo submits that although the conversations reveal "an attempt to cover what had transpired at the meeting," there is no indication that Baumgart was part of the conspiracy to obtain insurance proceeds.

We decline to accept Gajo's contention that the specific mention of insurance proceeds is a necessary condition for admissibility of a coconspirator's statements in this context. In our view, Gajo's assertion ignores one of the primary objectives of the crime in this case. As we have already discussed, an arson-for-profit scheme has two criminal objectives: the destruction of a building by fire and the attainment of insurance proceeds. However, a necessary corollary to the insurance scam is that the co-conspirators must conceal their illegal conduct from law enforcement and insurance investigators. See Zabick, 745 F.2d at 472-73; Xheka, 704 F.2d at 986. Thus, Baumgart's statements advanced the conspiracy's goal of falsely acquiring insurance proceeds, but only in the sense that concealment was a necessary predicate to achieving that criminal objective. Because Baumgart's statements reflect an attempt to avoid detection, he was furthering one of the conspiracy's

goals. See United Sates v. Kaden, 819 F.2d 813, 820 (7th Cir. 1987).

Finally, Gajo submits that the district court abused its discretion in allowing the jury to hear Smith's statements. Gajo argues that because Smith was never a member of the conspiracy, his statements were not admissible under FRE 801(D)(2)(E). After ruling the Baumgart-Smith conversations admissible, the district court acknowledged the problems associated with admitting Smith's declarations:

. . . given that the conversations in question were instigated by a non-conspirator cooperating with the government and given that many subjects not clearly germane to the objectives of the conspiracy were discussed (such as Smith's questions about whether anyone was harmed), the court will hear argument on the issue of whether any portions of the conversations should be redacted . . . .

United States v. Gajo, No. 98 CR 100 at 7-8. At this subsequent hearing, the district court redacted significant portions of the conversation between Baumgart and Smith, leaving the jury to hear only those statements that provided context to Baumgart's responses.

As a general proposition, the statements of a non-conspirator are not admissible under Rule 801(d)(2)(E). See Xheka, 704 F.2d at 986 n. 6 ("As [the informer] was acting on behalf of the government there is no question that his statements cannot be admitted under Rule 801(d)(2)(E)."); United States v. Williamson, 53 F.3d 1500, 1519 (10th Cir. 1995) ("the statements of the witness (the person to whom the out-of-court statements were made) are not admissible under this rule, but only the statements of the declarant/coconspirator that were made to the witness"). However, this is not a case where the district court admitted Smith's statements as non-hearsay, but rather to provide context to a coconspirator's statements properly admitted under Rule 801. It is well settled that such an approach is appropriate because statements are not hearsay to the extent they are offered for context and not for the truth of the truth of the matter asserted. See United States v. Davis, 890

F.2d 1373, 1380 (7th Cir. 1989); see also United States v. Gutierrez-Chavez, 842 F.2d 77, 81 (5th Cir. 1988) (statements on tape recording admissible "for the limited purpose of putting the responses of the appellant in context and making them 'intelligible to the jury and recognizable as admissions.'") (quoting United States v. Lemonakis, 485 F.2d 941, 948 (D.C. Cir. 1973)); United States v. Price, 792 F.2d 994, 997 (11th Cir. 1986) (statements admitted "to make understandable to the jury the statements made by" the defendant); United States v. Whitman, 771 F.2d 1348, 1352 (9th Cir. 1985) (no hearsay problem when tape recorded statements introduced to aid jury in understanding defendant's statements); United States v. Williams, 604 F.2d 1102, 1108 (8th Cir. 1979) ("the tape-recorded conversation was not hearsay because it was admitted to provide context for [the defendant's] end of the conversation."). Thus, while it is true that a district court should exercise great caution when admitting a non-conspirator's statements to provide context to admissible declarations, we find that the district court did not abuse its discretion in this case. The district court included only those statements necessary to provide meaning to Baumgart's responses and redacted the non-germane and unduly prejudicial aspects of the Baumgart-Smith conversations.

B.  Grand Jury Testimony

Gajo also submits that the district court abused its discretion when it admitted as substantive evidence a transcript of Smith's grand jury testimony. During Smith's cross-examination, Smith admitted that he could not remember whether Gajo spoke to him in English during the Banks Grill meeting. This cast some doubt on Smith's direct testimony that Gajo had told him in English that burning down Cragin Sausage was urgent./4 In response, the government moved to admit Smith's grand jury testimony, arguing that it was inconsistent with Smith's trial testimony. Before the grand jury, Smith had testified that Gajo told him in English that burning Cragin Sausage was "really important," that Gajo had to "have this done," and that Gajo needed

the building burned for "insurance money." The district court admitted this portion of the grand jury testimony, ruling that although the court could not determine if Smith was lying on the stand, his lack of memory could be considered an inconsistent statement under Rule 801. Gajo now challenges this decision.

Federal Rule of Evidence 801(d)(1) provides that a statement is not hearsay if "the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." Id. See also United States v. Keeter, 130 F.3d 297, 302 (7th Cir. 1997). Because a trial witness's grand jury testimony is not hearsay and is admissible as substantive evidence when it is inconsistent with his trial testimony, the issue we must address is whether a lack of memory at trial qualifies as an inconsistent statement. In United States v. DiCaro, 772 F.2d 1314 (7th Cir. 1985), and United States v. Williams, 737 F.2d 594 (7th Cir. 1984), we addressed this issue and suggested that memory loss is an appropriate justification for admitting prior grand jury testimony. Each case, however, involved a "turncoat" witness who effectively lied on the stand to avoid testifying at trial. Indeed, in DiCaro, we identified an underlying concern in both cases that "a recalcitrant witness might defraud both the parties and the court by feigning a lack of memory." DiCaro, 772 F.2d at 1322. Gajo attempts to seize this language and narrow the applicability of Rule 801(d) (1)(A) to situations involving a witness whose lack of memory is attributable to recalcitrance or other improper motives.

We first note that no court has addressed the precise issue presented by this appeal. To be sure, many circuits-- including this one in Williams and DiCaro--have held that in the context of the recalcitrant witness, a lack of memory is inconsistent with the description of specific details before the grand jury. See United States v. Milton, 8 F.3d 39, 46-47 (D.C. Cir.

1993); United States v. Bigham, 812 F.2d 943, 946 (5th Cir. 1987); United States v. Russell, 712 F.2d 1256, 1258 (8th Cir. 1983); United States v. Marchand, 564 F.2d 983, 999 (2d Cir. 1977). In contrast, only one court has suggested that a prior statement should not be admitted under Rule 801(d)(1)(A) if a witness genuinely cannot remember crucial facts related to the prior statement. See United States v. Palumbo, 639 F.2d 123, 128 n. 6 (3d Cir. 1981) (dicta).

After reviewing these precedents, we decline to adopt Gajo's narrow reading of Rule 801(d)(1)(A). Beyond the difficulty in administering such a rule, nothing in DiCaro or Williams suggests that the holdings in those cases should be limited to the turncoat witness. Indeed, Williams instructs that the term "inconsistent" in Rule 801(d)(1)(A) should not be confined to "statements [that are] diametrically opposed or logically incompatible," and that inconsistency "may be found in evasive answers, . . . silence, or changes in positions." 737 F.2d at 608 (citing United States v. Dennis, 625 F.2d 782, 795 (8th Cir. 1980)); see also United States v. Distler, 671 F.2d 954, 958 (6th Cir. 1981) ("when a witness remembers events incompletely, or with some equivocation at trial, it is not improper to admit a prior statement that otherwise complies with the limitations of Rule 801(d)(1), if that prior statement indicates that at an earlier time the witness remembered the events about which he testifies with more certainty or in more detail.")./5 Moreover, we believe that the district court is in a better position to evaluate the "multitude of factors" that help determine whether a witness's trial testimony is truly inconsistent with his or her prior grand jury testimony. See Williams, 737 F.2d at 608; DiCaro, 772 F.2d at 1321; see also Dennis, 625 F.2d at 795 ("The trial judge has considerable discretion in determining whether testimony is 'inconsistent' with prior statements.").

Here, the trial judge found that Smith's trial testimony (where he could not remember what Gajo said to him in English) was inconsistent with his grand jury testimony (where Smith specifically recounted what Gajo said). The trial judge also ruled that this was the only

inconsistency and limited the introduction of the grand jury testimony accordingly. We believe this was the appropriate course of action. In some cases, a witness's genuine lack of memory may be inconsistent with his prior testimony, which naturally occurred closer in time to the actual events described. Because we believe the trial judge is in the best position to make that determination, we find that the district court did not abuse its discretion in admitting limited portions of Smith's grand jury testimony.

III. Conclusion

The district court did not abuse its discretion in admitting the tape recorded conversations between Baumgart and Smith or in admitting Smith's prior grand jury testimony. As a result, we AFFIRM Gajo's conviction.

FOOTNOTES

/1 We recount the facts presented at trial in the light most favorable to the government. United States v. McGiffen, 267 F.3d 581, 584 (7th Cir. 2001).

/2 Gajo rebutted the inferences generated by this testimony by introducing evidence of a substantial settlement he received following the death of his wife.

/3 Gajo filed the initial insurance claim on January 24, 1996. The proof of loss included a sworn statement and supporting documentation related to the initial claim.

/4 The direct examination between Smith and the prosecutor proceeded as follows:

Q: Did Mr. Gajo himself speak English to you?

A: If he did--yes.

Q: Do you recall what he said?

A: It was urgent.

Q: What was urgent?

A: To get this building burned.

Q: When he said that it was urgent, was he speaking Polish?

A: No, English.

Tr. of Proceed. at 372-73.

/5 Although Distler did not explicitly involve a "turncoat" witness, the court implicitly suggested that many of the employee-witnesses had a motive to feign lack of memory, i.e., that their boss was a close friend of the defendant.